1
2
3
4
5
6

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

7

PAMELA C. CHESTER,

Case No. 2:15-cv-01724-JCM-PAL

8
                                                    Plaintiff,

**REPORT OF FINDINGS AND**
**RECOMMENDATION**

9
        v.

10
NANCY A. BERRYHILL, Acting
Commissioner of Social Security,[1]

(Mot. to Remand – ECF No. 14)
(Cross-Mot. to Affirm – ECF No. 15)

11
12
                                                    Defendant.

13          This matter involves Plaintiff Pamela C. Chester's appeal and request for judicial review

14  of the Acting Commissioner of Social Security, Defendant Nancy A. Berryhill's final decision

15  denying her claim for disability insurance benefits under Title II of the Social Security Act (the

16  "Act"), 42 U.S.C. §§ 401–33.

17                                          **BACKGROUND**

18          Plaintiff Pamela C. Chester ("Chester") was 47 years old and had worked as a banquet

19  server for 21 years when she applied for disability benefits on May 16, 2012 alleging disability

20  beginning April 11, 2012.  In her application, Chester claimed she was unable to work because of

21  low back pain and obesity.  AR[2] 182-189.  The Social Security Administration ("SSA") denied

22  Chester's application initially on December 10, 2012 (AR 71-74), and on reconsideration on June

23

24  [1] Nancy A. Berryhill is now the Acting Commissioner of Social Security.  Pursuant to the Federal Rules of
Civil Procedure and the Social Security Act, the court therefore substitutes Nancy A. Berryhill for Carolyn
25  W. Colvin as the defendant in this suit.  *See* Fed. R. Civ. P. 25(d) (allowing the automatic substitution of a
successor to a public officer who is a party to an action but ceases to hold office while the action is pending);
26  42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding
any change in the person occupying the office of Commissioner of Social Security or any vacancy in such
27  office.").

28  [2]  AR refers to the Administrative Record (ECF No. 13), a certified copy of which was delivered to the
undersigned upon the Commissioner's filing of her Answer.

11, 2014 (AR 76-78).  Chester requested a hearing by an Administrative Law Judge ("ALJ") (AR 79-80).  ALJ T. Patrick Hannon held a hearing on May 22, 2014.  AR 23.  Chester appeared with her attorney Charles Wasit from the law office of Harold Skovronsky.  *Id.*  Chester and vocational expert Robin Generaux testified at the hearing.  AR 23-41.

During the hearing, counsel asserted that Chester suffered from two significant illnesses and injuries, spinal disease, low back disease, and had a significant severe hernia problem with a history of surgeries for both conditions.  AR 27-28.  Additionally, counsel for Chester argued that she suffered from bilateral carpel tunnel syndrome as noted by the consultative examiner and her pain management specialist, Dr. Bien, for which she underwent carpel tunnel release procedures in 2006.  AR 28.  Counsel argued that these conditions in combination with her obesity at a height of 5' 2" and 185 pounds would equal or meet Listing 1.04.  AR 29.  Counsel asserted that even if Chester could perform a low level of sedentary work because of her carpel tunnel syndrome in both hands, she would not be able to frequently use her hands—a requirement for all jobs at the sedentary level.  *Id.*

In a decision dated July 18, 2014, the ALJ found that Chester was not disabled.  AR 23-41.  Chester requested a review of the ALJ's decision by the Appeals Council claiming the ALJ's decision was not supported by substantial evidence.  AR 6-8.[3]  The ALJ's decision became final when the Appeals Council denied review on July 15, 2015.  AR 1-5.

On September 8, 2015, Chester filed her Complaint (ECF No. 1) in federal court, seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).  The Commissioner filed her Answer (ECF No. 10) on December 22, 2015.  Chester filed a Motion to Remand (ECF No. 14), and the Commissioner filed a Cross-Motion for Summary Judgment and Response (ECF Nos. 15, 16).  The court has considered the Motion, the Cross-Motion and Response, and Chester's Reply (ECF Nos. 17, 18).

---

[3] The cover letter attached to the form request for review of hearing decision by Chester's counsel, Harold Skovronsky, stated a memorandum of law would follow.  AR 6.  However, there is no memorandum of law in the AR.

1

**DISCUSSION**

2

**I.    APPLICABLE LAW**

3

    **A.  Judicial Review of Disability Determination**

4         District courts review administrative decisions in social security benefits cases under 42

5    U.S.C. § 405(g).  *Akopyan v. Barnhart*, 296 F.3d 852, 854 (9th Cir. 2002).  The statute provides

6    that after the Commissioner has held a hearing and rendered a final decision, a disability claimant

7    may seek review of that decision by filing a civil lawsuit in a federal district court in the judicial

8    district where the disability claimant lives.  42 U.S.C. § 405(g).  The statute also provides that the

9    district court may enter, "upon the pleadings and transcripts of the record, a judgment affirming,

10    modifying, or reversing the decision of the Commissioner of Social Security, with or without

11    remanding the cause for a rehearing." *Id.*

12         The Commissioner's findings of fact are conclusive if supported by substantial evidence.

13    42 U.S.C. § 405(g); *Ukolov v. Barnhart*, 420 F.3d 1002 (9th Cir. 2005).  But the Commissioner's

14    findings may be set aside if they are based on legal error or not supported by substantial evidence.

15    *Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d 1050, 1052 (9th Cir. 2006); *Thomas v. Barnhart*, 278

16    F.3d 947, 954 (9th Cir. 2002).  The Ninth Circuit defines substantial evidence as "more than a

17    mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind

18    might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th

19    Cir. 1995); *see also Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005).  In determining

20    whether the Commissioner's findings are supported by substantial evidence, a court "must

21    consider the entire record as a whole and may not affirm simply by isolating a 'specific quantum

22    of supporting evidence'." *Ghanim v. Colvin*, 763 F.3d 1154, 1160 (9th Cir. 2014) (quoting *Hill v.

23    Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012)).

24         Under the substantial evidence test, a court must uphold the Commissioner's findings if

25    they are supported by inferences reasonably drawn from the record.  *Batson v. Comm'r Soc. Sec.*

26    *Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2003).  When the evidence will support more than one

27    rational interpretation, a court must defer to the Commissioner's interpretation.  *Burch v. Barnhart*,

28    400 F.3d 676, 679 (9th Cir. 2005).  Consequently, the issue before a court is not whether the

Commissioner could reasonably have reached a different conclusion, but whether the final decision is supported by substantial evidence.

It is incumbent upon an ALJ to make specific findings so that a court does not speculate as to the basis of the findings when determining if the Commissioner's decision is supported by substantial evidence. *See Burrell v. Colvin*, 775 F.3d 1133, 1140 (9th Cir. 2014). Mere cursory findings of fact without explicit statements about what portions of the evidence were accepted or rejected are not sufficient. *Lewin v. Schweiker*, 654 F.2d 631, 634 (9th Cir. 1981). An ALJ's findings should be comprehensive, analytical, and include a statement explaining the "factual foundations on which the ultimate factual conclusions are based." *Id. See also Vincent v. Heckler*, 739 F.2d 1393, 1394–95 (9th Cir. 1984) (an ALJ need not discuss all the evidence in the record but must explain why significant probative evidence has been rejected).

### B. Disability Evaluation Process

A claimant has the initial burden of proving disability. *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995). To meet this burden, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant must provide specific medical evidence to support his or her claim of disability. *Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998). If a claimant establishes an inability to perform his or her prior work, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful work that exists in the national economy. *See Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012) (noting that a claimant bears the burden of proof until the final step in the evaluation process).

## II.    THE ALJ'S DECISION

An ALJ follows a five-step sequential evaluation process in determining whether a claimant is disabled. 20 C.F.R. § 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). If at any step an ALJ makes a finding of disability or non-disability, no further evaluation is required. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003).

4

### A.  Step One

The first step of the disability evaluation requires an ALJ to determine whether the claimant is currently engaging in substantial gainful activity ("SGA").    20 C.F.R.  §§ 404.1520(b), 416.920(b).  SGA is defined as work activity that is both substantial and gainful; it involves doing significant physical or mental activities, usually for pay or profit.  20 C.F.R. §§ 404.1572(a)–(b), 416.972(a)–(b).  If the claimant is currently engaging in SGA, then a finding of not disabled is made.  If the claimant is not engaging in SGA, then the analysis proceeds to the second step.

At step one in the Decision, the ALJ found that Chester had not engaged in SGA since April 11, 2012, the alleged onset date.  AR 14.

### B.  Step Two

The second step of the disability evaluation addresses whether a claimant has a medically-determinable impairment that is severe or a combination of impairments that significantly limits him or her from performing basic work activities.  20 C.F.R. §§ 404.1520(c), 416.920(c).  An impairment or combination of impairments is not severe when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on the claimant's ability to work.  20 C.F.R. §§ 404.1521, 416.921; Social Security Ruling ("SSR") 85-28, 1985 WL 56856 (Jan. 1, 1985), SSR 96-3p, 61 Fed. Reg. 34468 (July 2, 1996); SSR 96-4p, 61 Fed. Reg. 34488 (July 2, 1996).[4]  If a claimant does not have a severe medically-determinable impairment or combination of impairments, then an ALJ will make a finding that a claimant is not disabled.  If a claimant has a severe medically-determinable impairment or combination of impairments, then an ALJ's analysis proceeds to the third step.

At step two in the Decision, the ALJ found that Chester had the following severe impairments: (i) degenerative disc disease, lumbar spine, and status post laminectomy and fusion; (ii) history of bilateral carpel tunnel syndrome; (iii) status post bilateral release operation; (iv) history abdominal hernia; and (v) adjustment disorder with depressed mood.  *Id.*

---

[4]  SSRs are the Agency's official interpretations of the Act and its regulations.  *See Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1224 (9th Cir. 2009); *see also* 20 C.F.R. § 402.35(b)(1).  SSRs are entitled to some deference as long as they are consistent with the Act and Agency regulations.  *See Bray*, 554 F. 3d at 1223.  "SSRs do not carry the 'force of law,' but they are binding on ALJs nonetheless."  *Id*. at 1224.

### C.  Step Three

Step three of the disability evaluation requires an ALJ to determine whether a claimant's impairments or combination of impairments meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, which is commonly referred to as the "Listings."  20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.826.  If a claimant's impairment or combination of impairments meet or equal the criteria of the Listings and meet the duration requirement, 20 C.F.R. §§ 404.1509, 416.909, then an ALJ makes a finding of disability.  20 C.F.R. §§ 404.1520(h), 416.920(h).  If a claimant's impairment or combination of impairments does not meet or equal the criteria of the Listings or meet the duration requirement, then the analysis proceeds to the next step.

When the Agency evaluates the severity of mental impairments, 20 C.F.R. § 404.1520a requires the use of a "special technique" to evaluate four broad functional areas known as the "Paragraph B Criteria" in Listing 12.00C of the Listing of Impairments set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1.  *Id.*; *see also* 20 C.F.R. § 1520a (explaining the psychiatric review technique); SSR 96-8p, 61 Fed. Reg. 34474 (July 2, 1996) (noting that application of the technique is documented on a Psychiatric Review Technique Form).  Paragraph B criteria require a claimant to show that he or she experienced marked limitations in mental function.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00.  To satisfy Paragraph B criteria, mental impairments must result in at least two of the following: (i) marked restriction in activities of daily living; (ii) marked difficulties in maintaining social functioning; (iii) marked difficulties in maintaining concentration, persistence, or pace; or (iv) repeated episodes of decompensation, each of extended duration.  *See, e.g.*, *id.* § 12.04(B).  A "marked" limitation means "more than moderate but less than extreme."  *Id.* § 12.00(C).  Repeated episodes of decompensation with extended duration means three episodes within one year, or an average of once every four months, each lasting for at least two weeks.  *Id.* § 12.00(C)(4).

If the Paragraph B criteria are not met, a claimant may nevertheless be found disabled under alternative Paragraph C criteria.  *Id.* § 12.00(A).  Under the regulations, Paragraph C criteria are considered only if the Paragraph B criteria are not satisfied.  *Id.*  Paragraph C criteria require a

medically documented history of a chronic affective disorder of at least two years duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: (1) repeated episodes of decompensation each of extended duration; or (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such arrangement. *See* §§ 12.02(C), 12.03(C), 12.04(C), 12.05(C), 12.06(C).

The ALJ determined that the evidence did not support a finding that Chester had the severity of symptoms required, either singly or in combination, to meet or equal one of the Listings. In reaching this conclusion, he considered the opinions of the State Agency medical consultants who reached the same conclusion initially and on reconsideration. AR 15. The ALJ found that in activities of daily living, Chester had mild restriction because she reported that she reads and was taking a computer class. *Id.* In social functioning, the ALJ found Chester had moderate difficulties. *Id.* As noted by the consultative examiner, Chester was cooperative, and rapport was easy to establish during the consultative examination. *Id.* The ALJ found that Chester had moderate difficulties in concentration, persistence or pace, but noted that Chester reported to the psychological consultative examiner that she was able to manage funds. *Id.* He noted that pursuant to SSR 96-8p the limitations identified in the "Paragraph B Criteria" are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps two and three of the sequential evaluation process. *Id.* The mental residual functional capacity assessment used at steps four and five of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in Paragraph B of the adult mental disorders listing in 12.00 of the Listings. *Id.* Therefore, his RFC assessment reflects the degree of limitation he found in the "Paragraph B" mental function analysis. *Id.*

The ALJ specifically evaluated the Paragraph B Criteria under Listing 12.04 and concluded that the greater weight of the evidence showed Chester suffered: (i) mild restrictions in activities

of daily living; (ii) moderate difficulties in social functioning; (iii) moderate limitations in concentration, persistence, or pace; and (iv) no episodes of decompensation that have been of extended duration. AR 15. The ALJ also considered Paragraph C criteria for Listing 12.04 and found the record lacked evidence of Paragraph C criteria. AR 15. The ALJ therefore concluded that she did not have an impairment or combination of impairments that meet or medically equal one of the impairments described in the Listings. *Id.*

### D. Step Four – RFC

The fourth step of the disability evaluation requires an ALJ to determine whether a claimant has the RFC to perform her past relevant work ("PRW"). 20 C.F.R. §§ 404.1520(f), 416.920(f). To answer this question, an ALJ must first determine a claimant's RFC. 20 C.F.R. §§ 404.1520(e), 416.920(e). RFC is a function-by-function assessment of a claimant's ability to do physical and mental work-related activities on a sustained basis despite limitations from impairments. SSR 96-8p, 61 Fed. Reg. 34474 (July 2, 1996). In making this finding, an ALJ must consider all the relevant evidence such as symptoms and the extent to which they can reasonably be accepted as consistent with the objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529, 416.929; SSR 96-4p, 61 Fed. Reg. 34488 (July 2, 1996); SSR 96-7p, 61 Fed. Reg. 34483 (July 2, 1996). To the extent that statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, an ALJ must make a finding on the credibility of a claimant's statements based on a consideration of the entire case record. An ALJ must also consider opinion evidence in accordance with the requirements of 20 C.F.R. §§ 404.1527 and 416.927 as well as SSR 96-2p, 61 Fed. Reg. 34489 (July 2, 1996); SSR 96-5p, 61 Fed. Reg. 34471 (July 2, 1996); and SSR 06-3p, 71 Fed. Reg. 45593 (Aug. 9, 2006).

After considering the entire record, the ALJ concluded that Chester had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), except she was limited to simple, repetitive tasks and limited interactions with coworkers, the public, and supervisors. *Id.* In making this finding, the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and the other evidence." *Id.* He also

considered opinion evidence.  *Id.*  Although the ALJ found that Chester's medically determinable impairments could reasonably be expected to cause her alleged symptoms, he determined that Chester's statements concerning the intensity, persistence and limiting effects of those symptoms were not credible to the extent they were inconsistent with the RFC Assessment.  *Id.*  The ALJ noted that Chester testified that she was unable to work due to low back pain and could only stand for 15 – 20 minutes and only walk for 15 – 20 minutes after which she needed to sit down and take a break, that she spent a lot of time in bed and that her husband helped her a lot.  AR 16.

The ALJ found that Chester's statements concerning the intensity, persistence, and limiting effects of her impairments were not fully credible for multiple reasons.  First, he noted that Chester had a history of abdominal hernias, but there was no indication in the AR that this condition would restrict her ability to perform less than light work.  *Id.* citing Exhibit 12F, the medical records from Dr. William Maranon dated May 1, 2013, at AR 521-522.  No treating physician had assigned any specific limitations to her ability to work because of her hernias, and after two abdominal surgeries, Chester was pleased with her results.  *Id.* citing Exhibit 16F at 1, the medical records from Nevada Pain Management at AR 539-578.[5]

Second, the ALJ found that, although Chester had a history of carpel tunnel syndrome, she had had little, if any, treatment records for this condition since the alleged onset date.  *Id.* citing Exhibit 16F, records of Nevada Pain Management dated July 2, 2013 to May 6, 2014, at AR 539-578.

Third, he found that his residual functional capacity determination was consistent with the opinions of the consultative examiners, citing exhibit 4F, Consultative Examination Report dated October 1, 2012, by Dr. Wenceslao Cabaluna at AR 429-438; and exhibit 5F, Consultative Psychology Report dated November 17, 2012, by Dr. Aisha Devera at AR 439-445.  He credited their opinions "given the supportability of the medical signs and laboratory findings, the consistency with the record, and the area of specialization."  *Id.*

---

[5] The comment that Chester was pleased with the results of her abdominal surgery is found in a May 8, 2014 report of an office visit at AR 539.

Fourth, with respect to her back surgeries, the ALJ found the surgeries were successful in alleviating her symptoms, citing Exhibit 2F, Treatment Records of Dr. Forage of Spine and Brain Institute at AR 262-332 dated April 11, 2011 to June 5, 2012; Exhibits 3F, Office Treatment Records from Nevada Pain Management, dated January 11, 2010 to July 3, 2012,AR 333-428; and 6F Treatment Records from Spine and Brain Institute, dated January 23, 2013 to January 29, 2013, AR 446-450.  The ALJ found that Chester suffered exacerbation of pain after her surgeries as documented in Exhibit 7F at 5, Office Treatment Records of Nevada Pain Management, dated August 28, 2012 to April 9, 2013AR 451-483.  However, these same records noted that Chester had recently been quite active, citing Exhibit 7F at 2, Office Treatment Records dated August 28, 2012 to April 9, 2013, from Nevada Pain Management at AR 451-483.[6]  Additionally, the ALJ cited a portion of the records at 16F, follow up visits with Nevada Pain Management indicating that Chester reported her pain medications improved her pain and function by 90%.  AR 539, 542.

Fifth, he found that her daily activities were not limited to the extent one would expect given her complaints of disabling symptoms and limitations.  AR 17.  He based this finding on her reported traveling to Michigan, citing Exhibit 3F at 2, office treatment records dated January 11, 2010 to July 3, 2012, from Nevada Pain Management (AR 333-428[7]), doing physical work around the house, citing Exhibit 16F at 4 and 7 (AR 542), and participating in water aerobics and hiking, citing Exhibit 16F at 1.  AR 539.

Finally, the ALJ found that the administrative record did not contain any opinions from treating or examining physicians indicating that Chester had limitations greater than those he found

---

[6] Page 2 of Exhibit 7F is an August 28, 2012 report of a follow up visit with Nevada Pain Management, Dr. Bien, which states Chester's chief complaint was low back, lower extremity, and abdominal pain at the time of the visit.  "She had quite a few lumbar spine surgeries.  Her most recent was in April 2012, when she had an extensive fusion from L3 through S1.  Pam was starting water aerobics, however, her husband has recently been put in the hospital and has been there for 15 days.  She finds herself spending a lot of time at the hospital doing a lot of sitting, bending, twisting, and turning to help him.  Pam is in today for medication refills.  She is tolerating her medication well without any side effects.  At last visit her Oxycodone 30 mg was decreased from #180 to #150 and we are going to continue to wean down her medications today."  AR 452.

[7] Page 2 of Exhibit 3F is a July 3, 2012 report of a follow up visit with Dr. Bien of Nevada Pain Management which states in part, "Pam has not been released to do physical therapy yet.  She states she is able to do some walking, but she does not do much walking.  She is in today for medication refills.  It was planned to start decreasing some of her oral pain medications.  However, she will be traveling tomorrow to Michigan where it is hot and humid.  She may not do well with less medications there."  AR 334.

1    for the required 12-month period, that is, an inability to engage in substantial gainful activity

2    because of her impairments for a continuous period of not less than 12 months.

3         **E.  Step Four – Ability to Perform PRW**

4         Once an ALJ has determined a claimant's RFC as an initial consideration at step four, an

5    ALJ utilizes the RFC assessment to determine whether a claimant can perform her past relevant

6    work (PRW).  20 C.F.R. §§ 404.1520(f), 416.920(f).  PRW means work a claimant performed

7    within the last 15 years, either as the claimant actually performed it or as it is generally performed

8    in the national economy.  20 C.F.R. § 404.1560(b).  In addition, the work must have lasted long

9    enough for a claimant to learn the job and to perform it as SGA.  20 C.F.R. §§ 404.1560(b),

10   404.1565, 419.960(b), 416.965.  If a claimant has the RFC to perform his or her past work, then

11   an ALJ makes a finding that a claimant is not disabled.

12        At step four in the Decision, the ALJ accepted the opinion of the vocational expert who

13   testified that, assuming the RFC the ALJ had found, Chester would not be able to perform the

14   requirements of her PRW as a banquet server.  AR 17.  As a result, the analysis continued to step

15   five.

16        **F.  Step Five**

17        Step five of the disability evaluation requires an ALJ to determine whether a claimant has

18   the ability to do any other work considering her RFC, age, education, and work experience.  20

19   C.F.R. §§ 404.1520(g), 416.920(g).  If she can do other work, then an ALJ makes a finding that a

20   claimant is not disabled.  Although a claimant generally continues to have the burden of proving

21   disability at this step, a limited burden of going forward with the evidence shifts to the

22   Commissioner.  The Commissioner is responsible for providing evidence that demonstrates that

23   other work exists in significant numbers in the national economy that the claimant can do.  *Yuckert*,

24   482 U.S. at 141–42; *see also Beltran v. Astrue*, 700 F.3d 386, 389 (9th Cir. 2012) (citing 42 U.S.C.

25   § 423(d)(2)(A)). At step five in the Decision, the ALJ determined that Chester could perform jobs

26   that exist in significant numbers in the national economy, considering her age, education, work

27   experience, and RFC, in conjunction with the Grids.  AR 17–18.

28

The Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, are commonly known as the "Grids," and specific sections are referred to as a Medical-Vocational rule. The Grids aid the ALJ in the analysis at step five for cases that cannot be evaluated on medical considerations alone. The Grids consist of three tables that each represent a different physical exertional level: sedentary, light, and medium work. *Id.* Each table also presents the vocational factors Congress has identified as important: age, education, and work experience. If a claimant can perform all or substantially all the exertional demands at a given exertional level, the Grids direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile. SSR 83-11, 1983 WL 31252 (Jan. 1, 1983). When a claimant cannot perform substantially all the exertional demands of work at a given level of exertion and/or has non-exertional limitations, the Grids are used as a framework for decision-making, unless there is a specific rule that directs a conclusion of "disabled" without considering the additional exertional and/or non-exertional limitations. *See* SSR 83-12, 1983 WL 31253 (Jan. 1, 1983); SSR 83-14, 1983 WL 31254 (Jan. 1, 1983). If the claimant has solely non-exertional limitations, Medical-Vocational Rule 204.00 provides a framework for decision-making. SSR 85-15, 1985 WL 56857 (Jan. 1, 1983).

If the claimant has the RFC to perform the full range of light work, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.21 and Rule 202.14. The ALJ found that Chester's ability to perform all or substantially all the requirements of light work has been impeded by additional limitations. He therefore asked the vocational expert whether jobs exist in the national economy for an individual with Chester's age, education, work experience, and residual functional capacity. AR 17-18, The vocational expert testified that given Chester's limitations Chester could perform the requirements of representative occupations such as mailing clerk, light work SVP 2 of which there were 268,000 jobs in the United States; and production helper, light work SVP 2 of which there were 84,000 jobs in the United States at the unskilled level. *Id.* The ALJ found the vocational expert's opinions were consistent with the information contained in the Dictionary of Occupational Titles. AR 18. Based on the testimony of the vocational expert, the ALJ concluded that considering Chester's age, education, work experience,

and residual functional capacity, Chester was capable successful adjustment to other work that exists in significant numbers in the national economy. *Id*. As a result, he made a finding that Chester was not disabled. *Id*.

### III. THE PARTIES' POSITIONS ON APPEAL

#### A. Chester's Position

Chester seeks reversal and remand of the ALJ's decision on the grounds the AR does not contain substantial evidence to support the Commissioner's finding that Chester is not disabled. On judicial review she abandoned the argument made at the administrative hearing that her severe impairments meet or equal the criteria of Listing 1.04. Additionally, she does not claim that her adjustment disorder with depressed mood meets the criteria for a severe mental impairment under Listing 12.04. Rather, she argues the ALJ's findings at steps three and five are not supported by substantial evidence for three reasons.

First, Chester argues the ALJ made a negative finding on her credibility without identifying legally sufficient reasons for doing so. Specifically, the ALJ found Chester's statements concerning the intensity, persistence, and limiting effects of her impairments were not entirely credible without identifying any legally sufficient reasons. Rather, Chester claims the ALJ made a boilerplate statement regarding her credibility which fails to comply with controlling Ninth Circuit law and Social Security regulations. Ms. Chester claims she sustained her burden of proving the existence of a medical condition that is reasonably likely to produce her subjective symptoms. The ALJ found that her degenerative disc disease, lumbar spine, status post laminectomy and fusion; history of bilateral carpel tunnel syndrome, status post bilateral release operation; history of abdominal hernia; and adjustment disorder with depressed mood were all severe medically determinable impairments. These impairments are reasonably likely to produce the subjective symptoms that Ms. Chester testified about during the administrative hearing. There is no evidence of malingering in the AR, nor any indication that her treating doctors questioned her report of symptoms. To the contrary, her testimony was consistent with statements she gave her pain management doctor throughout the life of this case.

In the Ninth Circuit, the ALJ must articulate clear and convincing reasons for rejecting a claimant's testimony regarding the intensity, persistence, and limiting effects of her impairments. General findings are insufficient.  In this case, the ALJ's only arguably articulated reason for finding Ms. Chester not entirely credible was that her daily activities were not as limited as one would expect given her complaints of disabling symptoms and limitations.  However, he did not identify what testimony was not credible and what evidence undermines her complaints. Moreover, on appeal, the court is limited to the reasons articulated by the ALJ and may not consider other reasons offered by the Commissioner as post hac rationale to support the ALJ's findings.

Second, Chester claims that the ALJ failed to account for her moderate limitation in maintaining concentration, persistence, or pace in his residual functional capacity assessment.  The ALJ limited Ms. Chester to simple repetitive tasks but did not adequately account for the moderate limitation in concentration, persistence, or pace. She contends the mental RFC assessment at steps four and five of the sequential evaluation process require a more detailed assessment than the psychiatric review technique evaluation.  The ability to perform simple unskilled work "cannot be presumed to include an assessment of the ability to overcome mental limitations."  Additionally, the ability to stick to a task over a sustained period does not mean she has the ability "to learn how to do tasks of a given complexity."   The ALJ therefore, committed error in failing to adequately account for Chester's moderate limitation in concentration, persistence, or pace.

Finally, Chester argues that the ALJ failed to assess any limitations associated with her history of bilateral carpel tunnel syndrome, and thus failed to include the required function-by-function RFC assessment based on all the relevant evidence.  Rather, the ALJ made a conclusory statement that Ms. Chester would be limited to light work and failed to address any limitations directly caused by her history of bilateral carpel tunnel syndrome.  By failing to make specific reference to her testimony and the objective evidence, the ALJ's decision failed to include the required function-by-function assessment required to determine residual functional capacity which is reversible error.

For these reasons, Chester asks that the court enter an order reversing the ALJ's decision and remand for an award of benefits, or in the alternative, remand this case for a new hearing and further administrative proceedings.

**B. The Commissioner's Position**

The Commissioner seeks affirmance of the ALJ's Decision asserting that the ALJ properly found Chester's statements were not entirely credible.  Congress passed 42 U.S.C. § 423(d)(5)(A), which expressly prohibits granting disability benefits based on a claimant's subjective complaints.  The Commissioner acknowledges that an ALJ's credibility finding must be properly supported by the record and sufficiently specific to ensure a reviewing court that the ALJ did not arbitrarily discredit a claimant's subjective testimony.  However, in this case the ALJ provided valid, legally-sufficient reasons for finding Chester's allegations less than fully credible.  Specifically, he found that her subjective complaints were inconsistent with the evidence of record which reflected good results from her surgeries and fewer functional limitations than Chester claimed.  The ALJ also credited the opinions of Consultative Examiners Drs. Cabaluna and Devera who reported generally benign findings and far fewer functional limitations than Chester claimed.

Dr. Cabaluna noted Chester had strong grip strength, tested negative on diagnostic tests for carpel tunnel syndrome, had no difficulties using her hands, exhibited a negative straight-leg raising test, normal sensation and motor function, and no evidence of muscle atrophy, normal gait and posture, no difficulty walking on heels and toes, no difficulty getting on or off of examination tables, and intact memory and concentration.  Dr. Cabaluna also opined that Chester could lift 10 pounds frequently and 20 pounds occasionally, stand or walk for 6 hours and sit for 6 hours in an 8-hour workday, and had no limitations on using her hands.

The ALJ also relied on Dr. Devera's report and opinions that Chester was unimpaired with respect to vocabulary and judgment, ability to understand, remember, and carry out one-to-two-step instructions, understand and remember detailed instructions, but had mild difficulty carrying out detailed instructions.  Dr. Devera opined Chester was mildly impaired in her ability to understand, remember, or carry out an extensive variety of complex instructions, but had adequate attention and concentration to carry out simple and detailed tasks with some difficulty

with complex tasks.  Dr. Devera also opined Chester's ability to interact appropriately with superiors, co-workers and the public might be somewhat limited.  The ALJ credited the opinions of Dr. Cabaluna and Devera whose opinions reasonably cast doubt on Chester's claims of disabling symptoms. The Commissioner points out Chester does not contest the opinions of Drs. Cabaluna and Devera.

More significantly, and as the ALJ's decision noted, no treating or examining physician found Chester had functional limitations greater than those the ALJ assessed in his RFC finding. Chester's medical records do not support the significant limitations she alleges, and no physician has indicated her hernias caused any functional limitations.

Although Chester has a history of carpel tunnel syndrome, this condition was treated with release surgery in 2006, 6 years before her alleged disability onset date.  Chester's testimony regarding problems with her hands and wrists at the administrative hearing are contradicted by Dr. Cabaluna's findings that she had strong grip strength, negative tests for carpel tunnel syndrome, and no difficulty with using her hands for various tasks such as opening a tightly-closed jar or picking up coins, no restrictions on using her hands for reaching, fingering, or handling objects. Additionally, the ALJ accurately explained that the medical evidence in the AR showed little, if any, treatments for carpel tunnel symptoms which called into question Chester's subjective complaints.

With respect to Chester's degenerative disc disease, her doctors noted her earlier surgery was successful and she received a good response.  Chester initially did well following the surgery, but later strained her back and the pain returned.  Her surgery was redone in April 2012.  Chester did well after surgery, her pain improved, and she had full motor strength in her extremities, intact sensation, and normal reflexes.  In July 2012, a pain management specialist wanted to decrease her pain medication and noted she was doing some walking and going on a trip to Michigan.  On later visits, Chester reported some pain, but also indicated she was doing Pilates, water aerobics, hiking, and assisting her hospitalized husband which involved bending, twisting, and turning.  Thus, the ALJ reasonably concluded the medical evidence showed her surgeries were successful in alleviating her symptoms which undermine Chester's claim of disabling pain.

The ALJ also appropriately found that Chester's testimony that she could drive short distances, read, use a computer, grocery shop with assistance, manage funds, prepare small meals and fix coffee, dress and bathe independently, and do light housework belied her assertion of having debilitating physical or mental impairments.

In short, the Commissioner argues the ALJ appropriately discounted Chester's credibility based on the opinion evidence, medical records, and Chester's testimony concerning her daily activities.

The Commissioner contends the ALJ appropriately addressed Chester's alleged mental limitations in the RFC assessment. The ALJ considered the symptoms and the extent to which those symptoms could reasonably be accepted as consistent with the evidence in the record. He also considered the medical evidence including medical source statements and found that Chester' medically determinable impairments could reasonably be expected to cause some of her alleged symptoms, but that her statements regarding the intensity, persistence, and limiting effects of those symptoms were not entirely credible. He concluded Chester could perform light work with the non-exertional limitations that she was limited to simple, repetitive tasks and limited interaction with co-workers, the public, and supervisors.

There is no merit to Chester's contention that the limitation to simple repetitive work in the RFC was inconsistent with the ALJ's step three finding that Chester had moderate difficulties with persistence, concentration, or pace. This argument lacks merit because Chester conflates the ALJ's step three finding with his RFC assessment. These are distinct steps based on different standards. The limitations identified in the Paragraph B Criteria are not an RFC assessment, but are used to rate the severity of mental impairments at steps two and three of the sequential evaluation process. The ALJ found Chester had a severe mental impairment that did not meet or medically equal a listed impairment. Chester does not contest this finding. The ALJ credited the opinion of Consultative Psychologist Dr. Devera who opined that Chester no limitations in her ability to understand, remember, and carry out simple instructions, and had adequate attention and concentration skills to carry out simple and detailed tasks.

The Commissioner also argues that Chester's argument is foreclosed by the Ninth Circuit's decision in *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir 2008). There, the Ninth Circuit held that the ALJ properly accommodated the claimant's moderate limitations in concentration, persistence, and pace by assessing an RFC for simple, routine repetitive work. Here, as in *Stubbs-Daniels*, the ALJ's finding that Chester was limited to simple repetitive work adequately accommodated the moderate limitations in her concentration, persistence, or pace identified at step three of the sequential evaluation process.

Finally, the Commissioner maintains there is no merit to Chester's argument that the ALJ's RFC assessment should have accounted for alleged limitations from her carpel tunnel syndrome. Residual functional capacity is the most a claimant can do despite her limitations and is based on the relevant evidence in the record. In this case, the ALJ appropriately synthesized the medical opinions and other record evidence which showed that Chester had few functional limitations and none whatsoever from her carpel tunnel syndrome. At step two, the ALJ determined that Chester's carpel tunnel syndrome more than minimally limited her ability to perform basic work activities. However, this was not an RFC assessment. Additionally, Chester fails to identify exactly what functions the ALJ failed to assess. She provides no citation to the record showing that her carpel tunnel syndrome limited her in any respect from the alleged onset date other than her own discredited testimony.

The medical evidence shows Chester underwent release surgery six years before her claimed disability onset date and had little, if any, treatment for carpel tunnel syndrome and no problems using her hands during the time relevant to her disability claim. The Commissioner reiterates that Dr. Cabaluna found Chester had strong grip strength, negative diagnostic tests for carpel tunnel syndrome, no difficulty using her hands for tasks such as tying a knot and buttoning clothing, and no limitations on reaching, fingering or handling objects. Chester has not identified any evidence to the contrary in the medical record.

The court should therefore affirm the Commissioner's decision because it is supported by substantial evidence and free from material or reversible error. If the court determines that the ALJ committed reversible error, remand for an award of benefits is not warranted because the

1    record raises serious doubts as to whether Chester was disabled. No treating or examining

2    physician found Chester had functional limitations greater than those assessed in the ALJ's RFC.

3    Rather, the consultative examiners' opinions showed Chester was not as limited as she claimed,

4    and Chester had engaged in activities inconsistent with her complaints of disabling symptoms and

5    limitations. If the court finds the ALJ committed legal error, the court should therefore remand

6    the case so that the Commissioner may correct any error.

7    **IV.    ANALYSIS AND FINDINGS**

8    The court has reviewed the record weighing both the evidence that supports and the

9    evidence that detracts from the ALJ's conclusion and finds the ALJ's decision is supported by

10    substantial evidence, and the ALJ did not commit legal error.

11    **A.  The ALJ Properly Evaluated Chester's Credibility**

12    The Ninth Circuit has established a two-step analysis for determining the extent to which

13    a claimant's symptom testimony must be credited. *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th

14    Cir. 2012). In the first step, the ALJ must determine whether the claimant has presented objective

15    medical evidence of an underlying impairment that could reasonably be expected to produce the

16    pain or other symptoms alleged. *Leon v. Berryhill*, 880 F.3d 1041, 1046 (9th Cir. 2017); *Garrison

17    v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014). In this first step, a claimant need only show that his

18    or her impairment could reasonably have caused *some degree* of the symptom alleged. *Garrison*,

19    759 F.3d at 1014 (quoting *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996)). A claimant is

20    not required to show that the impairment could reasonably be expected to cause the severity of the

21    symptoms or produce objective medical evidence of the pain, fatigue, or the severity thereof. *Id.*

22    If a claimant satisfies the first step of this analysis, and there is no evidence of malingering,

23    the ALJ may only reject the claimant's testimony about the severity of her symptoms by offering

24    "'specific, clear and convincing reasons'" for doing so. *Leon*, 880 F.3d at 1046 (quoting *Treichler

25    v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1101–02 (9th Cir. 2014)).[8] As the Ninth Circuit

26    _____

27    [8] The Commissioner acknowledges that the Ninth Circuit sometimes employs a "clear and convincing"
standard when reviewing an ALJ's decision to discredit a claimant's testimony but maintains that the

28    standard is inconsistent with the deferential "substantial evidence" standard prescribed by Congress in 42
U.S.C. § 405(g) and agency regulations and rulings. *See* Cross-Mot. & Resp. (ECF No 15) at n.1. The

has recognized, this is not an easy requirement to meet because the "clear and convincing standard is the most demanding required in Social Security cases." *Garrison*, 759 F.3d at 1015 (quoting *Moore v. Comm'r Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).  However, "the ALJ is not required to believe every allegation of disabling pain," otherwise disability benefits "would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)." *Molina*, 674 F.3d at 1112 (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)).

In evaluating a claimant's testimony, the ALJ may use "ordinary techniques of credibility evaluation." *Molina*, 674 F.3d at 1112 (quoting *Turner v. Comm'r Soc. Sec.*, 613 F.3d 1217, 1224 n.3 (9th Cir. 2010)).  For example, an ALJ may consider factors such as: (i) inconsistencies either in the claimant's testimony or between the testimony and the claimant's conduct; (ii) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (iii) whether the claimant engages in daily activities inconsistent with the alleged symptoms; (iv) the observations of treating and examining physicians and other third parties regarding the claimant's symptoms; (v) functional restrictions caused by the symptoms; and (vi) the claimant's daily activities.  *Molina*, 674 F.3d at 1112; *Rounds*, 807 F.3d at 1006; *Smolen*, 80 F.3d at 1284.

"A finding that a claimant's testimony is not credible 'must be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding pain'." *Brown-Hunter*, 806 F.3d at 493 (quoting *Bunnell*, 947 F.2d at 345–46).  "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Brown-Hunter*, 806 F.3d at 493 (quoting *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998)); *see also Rounds*, 807 F.3d at 1006 (an ALJ must specify "which symptom testimony is not credible and what facts in the record lead to that conclusion") (quoting *Smolen*, 80 F.3d at

Ninth Circuit has specifically and repeatedly rejected this position.  *See*, *e.g.*, *Brown-Hunter v. Colvin*, 806 F.3d 487, 492–93 (9th Cir. 2015) (noting that the Commissioner disputed the "clear and convincing" standard and finding that *Burrell* foreclosed the Commissioner's argument); *Burrell v. Colvin*, 775 F.3d 1133, 1136–37 (9th Cir. 2014); *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014); *see also Trevizo v. Berryhill*, 871 F.3d 664, 678–79 (9th Cir. 2017) (stating the clear and convincing standard).  The Commissioner maintains that the ALJ's reasons are sufficient under any standard, the Commissioner is objecting to preserve the record.

1284); *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001) ("the ALJ must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony").  "Although the ALJ's analysis need not be extensive, the ALJ must provide some reasoning" that will allow a reviewing court "to meaningfully determine whether the ALJ's conclusions were supported by substantial evidence." *Brown-Hunter*, 806 F.3d at 495 (quoting *Treichler v. Comm'r Soc. Sec. Admin.*, 775 F.3d 1090, 1103 (9th Cir. 2014)).

The court finds ALJ's credibility findings are supported by substantial evidence. The Decision articulates specific reasons for determining that Chester's testimony was not credible. The court's review of the AR supports the ALJ's finding that although Chester had a history of abdominal hernias, there was no indication that this condition would restrict her ability to perform less than light work.  No treating physician has ever assigned any specific limitations to her ability to work because of her hernias.  Moreover, record supports the ALJ's findings that Chester reported to her pain management specialist, Dr. Bien, that she was pleased with the results of her abdominal surgeries.

Second, the ALJ correctly found that, although Chester had a history of carpel tunnel syndrome, the AR did not show that she had received any treatment for this condition since the alleged onset date.  Chester's motion cites no portion of the AR other than her own testimony indicating she has had any ongoing issues related to carpel tunnel syndrome.  Chester cites no portion of the medical record indicating she has any limitations related to her carpel tunnel syndrome.

The ALJ's finding of no limitations associated with her carpel tunnel syndrome is also supported by Dr. Cabaluna's October 1, 2012 examination and report.  AR 429-438.  Dr. Cabaluna reviewed Chester's medical records and conducted a consultative examination at the request of the Bureau of Disability Adjudication Services.  AR 429.  Her report lists Chester's complaints at the time of the examination.  *Id.* Her only complaints concerned her back and spine. Chester told Dr. Cabaluna that she was "diagnosed with bilateral carpel tunnel syndrome ten years ago" and had carpel tunnel release surgeries but did not complain of any pain or other problems.  *Id.*  The

doctor's report specifically noted that when Chester was asked if she had any other complaints to present, she stated none.  *Id.*

On physical examination, Dr. Cabaluna found that Chester's hand grasp was 5/5 on both sides where 5/5 is strong.  AR 432.  She tested negative for carpel tunnel syndrome.  *Id.*  Dr. Cabaluna found that Chester could pick up a coin from a flat surface and place it in a container with each hand with no difficulty, tie a knot with no difficulty, button and unbutton her shirt with no difficulty, and open a tightly-closed lid jar with each hand with no difficulty.  *Id.*  She found Chester was not limited in reaching, fingering or handling objects. AR 438. Dr. Cabaluna also found Chester could lift or carry 10 pounds frequently and occasionally carry 20 pounds.  AR 437. In short, nothing in the record aside from Chester's testimony supports a finding that Chester has any limitations related to her carpel tunnel syndrome prior to or after her alleged disability onset date of April 11, 2012.  To the contrary the medical evidence is consistent with the ALJ's findings she had no work-related limitations as a result of carpal tunnel syndrome.

The ALJ also correctly found that Chester was not fully credible to the extent her testimony was inconsistent with his residual functional capacity determination because the RFC was consistent with the findings of Dr. Aisha Devera.  Dr. Devera conducted a mental status examination at the request of the Bureau of Disability Adjudication on November 17, 2012.  AR 439-445.  She conducted a records review and examined Chester.  Dr. Devera asked Chester what difficulties were limiting her abilities to sustain employment.  AR 440.  Chester related her history of carpel tunnel syndrome in both hands, four back surgeries, and two carpel tunnel releases, as well as hernia problems.  *Id.*  Devera reported "she is able to walk, sit, and stand five to ten minutes, must frequently shift positions, and has difficulty bending over.  Chester also reported frequent headaches." *Id.*  Chester reported symptoms of depression and anxiety secondary to chronic pain and physical limitations for the past three years.  *Id.*  Chester told Dr. Devera that she could no longer walk the dogs, work, or clean her home, had poor concentration, must re-read items, and had difficulty remembering.

Dr. Devera's mental status examination found that Chester was alert and oriented to person, place, time, and situation.  AR 441.  Her speech was of normal rate and volume and thought

1    processes were logical and goal directed. *Id.* Concerning her cognitive function, Dr. Devera found

2    Chester's fund of information was mildly impaired, her vocabulary was unimpaired, cognitive

3    function similarity testing was mildly impaired, and her judgment was unimpaired.  AR 442.

4    Chester reported to Dr. Devera that her major stressors were her health, finances, and being unable

5    to work.  *Id.*  Chester reported she was able to initiate and maintain friendships; however, her social

6    life was limited due to chronic pain and that she had been trying not to sleep as much.  *Id.*

7          Dr. Devera concluded that Chester put forth good effort in completing the evaluation.  AR

8    443.  Dr. Devera's functional assessment was that Chester had no impairment in her ability to

9    understand, remember, and carry out simple one or two-step instructions.  *Id.*    Chester

10   demonstrated no impairment in her ability to understand or remember detailed instructions, but

11   had mild difficulty carrying out detailed instructions.  Chester had mild impairment in her ability

12   to understand, remember, and carry out an extensive variety of complex instructions in a work

13   setting.  *Id.*  Chester appeared to have adequate attention and concentration skills to carry out

14   simple and detailed tasks; however, she demonstrated some difficulty maintaining attention in

15   concentration to carry out complex tasks.  *Id.*  Dr. Devera found that Chester's ability to interact

16   appropriately with supervisors, coworkers, and the public may be somewhat limited as she

17   presented with a restricted affect and was tearful at times and appeared stiff and grimaced at times.

18   *Id.*  Dr. Devera opined that Chester's prognosis is fair to guarded as mental health symptoms are

19   reported secondary to, and could be exacerbated by, chronic pain and physical limitations.  AR

20   444.  She recommended that Chester continue with psychiatric care and might benefit from therapy

21   to enhance her coping skills.  *Id.*  A medical evaluation was recommended because Chester

22   reported medical issues impaired her ability to work.  *Id.*  Chester was able to manage funds.  *Id.*

23         The ALJ's findings with respect to Chester's back condition are also supported by the

24   record as are his findings that her daily activities were not limited to the extent one would expect

25   given her complaints of disabling symptoms and limitations.

26         There are multiple references in the treatment records of her pain management specialist

27   in the AR that refer to Chester being active, taking water aerobics, hiking, and traveling.  There

28   are multiple references in the records indicating her pain management specialist wanted to decrease

her pain medications and try to wean her from pain medication. For example, a March 12, 2013 office visit with her pain management specialist, Dr. Bien, states Chester's chief complaint at the time of the visit was low back pain, and right shoulder pain. AR 476. Chester was upset with the decrease in her medications. *Id.* This record reflects that Chester was complaining of increased pain necessitating increased narcotic usage before her last office visit and was using a lot of oral medications before and since her last surgery in April 2012. *Id.* The doctor indicated he was trying to wean her down from some of her narcotics, although she was resistant. *Id.* Her biggest pain complaint was her lower back. *Id*. The doctor commented that "she remains quite active*." Id*. She felt that Pilates exercises helped her a lot, in addition to water exercises. *Id.* She had been attending PT for her lower spine and found it quite effective. *Id*. She had also recently been golfing in Santa Barbara. *Id*.

The ALJ's credibility determination based on the lack of any opinion testimony from any treating or examining physicians indicating that Chester had limitations greater than those he found is supported by the court's review of the record. Chester's motion cites no medical opinion evidence supporting her claims of limitations greater than the ALJ found. There is simply no medical opinion testimony in the AR in this case indicating Chester had limitations greater than those the ALJ found for a continuous 12-month period required to qualify for disability benefits. There is no medical opinion testimony in the record substantiating her claim of an inability to engage in substantial gainful activity because of her combination impairments for a continuous period of not less than twelve months from the alleged date of onset.

Additionally, the Decision shows that the ALJ did not reject Chester's complaints in their entirety. The ALJ gave Plaintiff the benefit of the doubt by restricting her to light work, consistent with Dr. Cabaluna's assessment, with the additional non-exertional limitations to simple, repetitive tasks and limited interactions with coworkers, the public, and supervisors. *See* AR 15.

To the extent there were conflicting opinions and testimony regarding the degree of Plaintiff's functional limitations, it was the ALJ's duty to resolve those conflicts. For highly fact-intensive individualized determinations like a claimant's entitlement to disability benefits, Congress has deferred to agency expertise and, for the sake of uniformity, has minimized the

opportunity for reviewing courts to substitute their discretion for that of the agency. *Treichler*, 775 F.3d at 1098 (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 621 (1966)). Consequently, it is the ALJ's duty "to determine credibility, resolve conflicts in the testimony, and resolve ambiguities in the record." *Id*. (citing 42 U.S.C. § 405(g) (noting that the Commissioner's findings shall be conclusive as to any fact supported by substantial evidence); *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

Here, the ALJ's findings regarding Chester's functional limitations are supported by the opinions of Dr Cabaluna and Dr. Devera.   Chester does not cite a single medical record of a treating or examining physician who opines she was unable to work or had any limitations beyond what the ALJ accounted for in his RFC assessment.   The ALJ's credibility findings are amply supported by the record and inferences reasonably drawn from the record.

### B.  The ALJ's Mental RFC Findings Sufficiently Accounted for Chester's Moderate Limitation

Chester argues that the ALJ failed to account for her moderate limitation in maintaining concentration, persistence, and pace in his RFC assessment.  Chester agrees that the ALJ found that she suffered from a severe mental impairment and concedes her mental impairment does not meet or medically equal a listed impairment.  However, she cites unpublished Ninth Circuit decisions, *Lubin v. Commissioner*, 507 Fed. Appx. 709 (9th Cir. Feb. 8, 2013), and *Brink v. Commissioner*, 343 F.Appx. 211 (9th Cir. 2009) for the proposition that a limitation to one-to-three-step tasks does not adequately capture the limitation in concentration, persistence, and pace. She claims the ALJ's conclusion that she was limited to "simple, repetitive tasks" failed to adequately account for the moderate limitations in concentration, persistence and pace.  The court disagrees.

Unpublished dispositions or orders of the Ninth Circuit may not be cited as precedent, except when relevant under the doctrine of law of the case, or rules of claim preclusion or issue preclusion.  *See* Ninth Circuit Rule 36-3(a); *Hart v. Massanari*, 266 F.3d 1155, 1190 (9th Cir. 2011).  However, unpublished dispositions in orders issued from 2007 forward may be cited as persuasive authority.  *Animal Legal Def. Fund v. Veneman*, 490 F.3d 725, 723 (9th Cir. 2007)

(citing Ninth Circuit Rule 36-3(b); Fed. R. App. P. 31.2(a)).  For the reasons explained below, the court finds the Ninth Circuit holding in *Stubbs-Danielson v. Astrue*, 539 F.3d, 116 (9th Cir. 2008) is binding authority which disposes of the arguments that Chester advances here.

Chester relies on SSR 96-8p describing the psychiatric review technique to argue the ALJ erred in not providing a more detailed assessment of her mental limitations at steps four and five of the sequential evaluation process.  The regulations require use of the Psychiatric Review Technique Form (PRTF) to document application of the technique and rate the degree of a claimant's functional limitation in four broad functional areas—the Paragraph B Criteria.  Chester concedes her mental impairment does not meet or medically equal a listed impairment.  The PRTF is a merely a "checklist" summarizing the findings related to Paragraph B Criteria.  *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 725 (9th Cir. 2011) (citation omitted).  Moreover, the limitation described in the Paragraph B Criteria are not an RFC assessment.  Rather, the limitations identified in the Paragraph B Criteria are used to rate the severity of mental impairments at steps two and three of the sequential evaluation process.  *See* 20 C.F.R. § 404.1520a(d); 20 C.F.R., part 404, subpt. P, Appx. 1, listing 12.00 et seq.; SSR 96-8p.  The ALJ determines a claimant's RFC in compliance with 20 C.F.R. § 404.1545 only after performing the sequential analysis at steps two and three and finding she does not satisfy the criteria to be found disabled.  20 C.F.R. § 404.1520a(d).

The ALJ assesses a claimant's RFC based on all the relevant evidence in the record. *Laborin v. Berryhill*, 867 F.3d 1151, 1153 (9th Cir. 2017) (quoting 20 C.F.R. § 416.945(a)(1)). The "ALJ's assessment of a claimant adequately captures restrictions related to concentration, persistence, or pace where the assessment is consistent with the restrictions identified in the medical testimony." *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1174.  "The ALJ is responsible for translating and incorporating clinical findings into a succinct RFC." *Rounds v. Comm'r of Soc. Sec. Admin.*, 807 F.3d 996, 1106 (9th Cir. 2015) (citing *Stubbs-Danielson*, 539 F.3d at 1174).

"Preparing a function-by-function analysis for medical conditions or impairments that the ALJ found neither credible nor supported by the record is unnecessary." *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005) (affirming decision where, in making a RFC determination, the

ALJ took into account the limitations for which there was record support that did not depend on subjective complaints); *cf. Hoopai v. Astrue*, 499 F.3d 1071, 1078 (9th Cir. 2007) (rejecting contention that ALJ erred by not issuing additional, specific findings and holding that "ALJ clearly met the requirements" by rating and assessing the limitations in each functional area). Thus, the requirement of a "*more detailed* assessment" in Chester's RFC analysis was satisfied when the ALJ provided a narrative explanation of his findings rather than simply incorporating the checklist of Paragraph B Criteria summarized on the PRTF.  SSR 96-8p

Moreover, Chester's arguments are foreclosed by the Ninth Circuit's decision in *Stubbs-Danielson v. Astrue*, 539 F.3d 1169 (9th Cir. 2008).  There, the Ninth Circuit followed earlier decisions in the Sixth and Eighth Circuits holding that "an ALJ's assessment of a claimant adequately captures restrictions related to concentration, persistence, or pace where the assessment is consistent with restrictions identified in the medical testimony."  *Id.* at 1174.

In *Stubbs-Danielson*, the Ninth Circuit addressed a claimant's denial of disability benefits in the context of claimed mental and physical limitations.  Evaluations were conducted by two physicians and one psychologist. Dr. McCollum evaluated Stubbs-Danielson  and diagnosed her with borderline intellectual functioning and opined she showed good persistence, but slow pace in thought and action.  *Id.* at 1171.  Dr. McCollum found Stubbs-Danielson could follow three-step instructions. Dr. McCollum made other findings with respect to her intellectual functioning, verbal comprehension, perceptional organization, abstract thinking and the like. Dr. McCollum also did a Mental Residual Functional Capacity assessment which found Stubbs-Danielson moderately limited in several other functioning areas. *Id* at 1173. He did not, however, assess whether Stubbs-Danielson could perform unskilled work on a sustained basis. *Id.*

Dr. Eather, a state agency reviewing psychologist, assessed whether Stubbs-Danielson could perform unskilled work on a sustained basis.  *Id.*  Dr. Eather found Stubbs-Danielson functioned at a "slow pace, both in thinking & in actions" and had several moderate limitations in other mental areas. However, he concluded she had the ability to "carry out simple tasks" as evidenced by her activities of daily living.  Dr Eather opined Stubbs-Danielson could perform simple work without public contact. *Id.*

1    Stubbs-Danielson's application for disability was denied.  The ALJ found at step three of

2    the sequential evaluation process that Stubbs-Danielson's conditions did not meet or equal a listed

3    impairment and that her allegations regarding her limitations were not entirely credible.  The ALJ

4    determined that she had the RFC to perform simple, routine, repetitive, sedentary work requiring

5    no interaction with the public.

6    On appeal, Stubbs-Danielson claimed that the ALJ improperly rejected the opinions of the

7    treating and examining doctors as well as Stubbs-Danielson's own subjective complaints.  *Id.* at

8    1173.  More specifically, she argued that the ALJ's RFC assessment did not capture the deficiency

9    in pace and other limitations identified by Dr. McCollum and Dr. Eather.  *Id.*  The Ninth Circuit

10   disagreed finding that the ALJ appropriately "translated Stubbs-Danielson's condition, including

11   the pace and mental limitations, into the only concrete restrictions available to him—Dr. Eather's

12   recommended restriction to 'simple tasks.'"  *Id.* at 1174.  The Ninth Circuit explicitly rejected

13   Stubbs-Danielson's argument that the ALJ's RFC assessment restricting Stubbs-Danielson to

14   "simple tasks" constituted a rejection of Dr. McCollum's opinions.  *Id.* at 1174.  The Ninth Circuit

15   also found that Dr. Eather's assessment was consistent with Dr. McCollum's mental RFC

16   assessment which found Stubbs-Danielson was not significantly limited in her ability to carry out

17   very short simple instructions, maintain attention and concentration for extended periods, and

18   sustain an ordinary routine without special supervision.  Joining two sister circuits, the Ninth

19   Circuit found that "an ALJ's assessment of a claimant adequately captures restrictions related to

20   concentration, persistence, or pace where the assessment is consistent with restrictions identified

21   in the medical testimony."  *Id.*

22   At step five, the ALJ must consider four factors to consider whether a claimant can work—

23   age, education, work experience and RFC. 20 C.F.R.404.1520(g). In *Hoopai v. Astrue*, 499 F.3d

24   1071, 1076 (9th Cir. 2007), the Ninth Circuit explained that the step two and step five

25   determinations "require different levels of severity of limitations such that the satisfaction of the

26   requirements at step two does not automatically lead to the conclusion that the claimant has

27   satisfied the requirement at step five."  The claimant argued the ALJ erred at step five because he

28   had found the claimant's depression was a significant non-exertional limitation and was therefore

required to seek the testimony of a vocational expert rather than rely on the grids to determine what work the claimant could do.  The Ninth Circuit rejected this argument explaining that this would defeat the purpose of the grids.  The Ninth Circuit pointed out that at step two the ALJ did not find that the claimant's depression alone was severe.  Rather, he found the claimant's depression and back pain were severe. The Ninth Circuit rejected Hoopai's argument that a severity finding at step two automatically satisfies the severity requirement at step five because "[t]he regulations guiding the step-two determination of whether disability is severe is merely a threshold determination of whether the claimant is able to perform his past work." *Id.* The step five determination ascertains whether there is a significant number of jobs in the national economy the claimant can perform. *Id.*  Because there was substantial evidence in the record in the form of the psychological evaluations, the Ninth Circuit found the ALJ had not erred at step five in concluding the claimant could perform light work that existed in significant numbers in the national economy.

Here as in *Hoopai*, the ALJ did not find that Chester's adjustment disorder with depressed mood alone was severe.  Rather, he found that this disorder in combination with her other impairments were severe.  *Hoopai* rejected the argument Chester advances here by explaining "the step two and step five determinations require different levels of severity of limitations such that the satisfaction of the requirements at step two does not automatically lead to the conclusion that the claimant has satisfied the requirements at step five." *Id.* at 1076.  Rather, "the regulations guiding the step-two determination of whether a disability is severe is merely a threshold determination of whether the claimant is able to perform his past work." *Id.* at 1076.  As the Ninth Circuit explained, a finding that a claimant has a severe impairment at step two "only raises a prima facie case of a disability." *Id.*  However, the determination at step five of the sequential evaluation "is necessary to ascertain whether there is a significant number of jobs in the national economy that the claimant can perform." *Id.*

In this case, the ALJ relied on the Medical Vocational Rules 202.21 and 202.14 which would direct a finding of not disabled if a claimant had the residual functional capacity to perform the full range of light work.  AR 18.  However, because the ALJ found Chester's ability to perform

all or substantially all of the requirements of light work had been impeded by additional non-exertional limitations, he used the testimony of the vocational expert to determine the extent to which her limitations would erode the unskilled light occupational base. *Id.* He then asked the vocational expert whether, given Chester's age, education, work experience, and residual functional capacity, she could perform jobs that exist in significant numbers in the national economy. *Id.* The vocational expert identified the representative occupations she could perform. Pursuant to SSR 00-4p, the ALJ determined that the vocational expert's testimony was consistent with the information contained in the Dictionary of Occupational Titles. *Id.*

For the reasons explained, the court finds the ALJ's finding at step five that Chester could perform representative jobs that exist in substantial numbers in the national economy is supported by substantial evidence and free of legal error.

### C. The ALJ Did Not Err in Failing to Assess Limitations as a Result of Chester's History of Bilateral Carpel Tunnel Syndrome

There is no question that Chester had a documented history of bilateral carpel tunnel syndrome and had bilateral carpel tunnel release procedures performed in 2006. However, the ALJ's finding that she had little, if any, treatment records for the condition since the alleged onsite of the disability is supported by the AR. His findings are also consistent with the opinions of consultative examiner, Dr. Cabaluna. Finally, as set forth in more detail on page 21 of this Report of Findings and Recommendation, on physical examination, Dr. Cabaluna found that Chester had a hand grasp of 5/5 on both sides where 5/5 is strong. AR 432. She tested negative for carpel tunnel syndrome. *Id.* Dr. Cabaluna found that Chester could pick up a coin from a flat surface and place it in a container with each hand with no difficulty, tie a knot with no difficulty, button and unbutton her shirt with no difficulty, and open a tightly-closed lid jar with each hand with no difficulty. *Id.* She could lift or carry 20 pounds occasionally and 10 pounds frequently and had no limitations in reaching, fingering and handling objects, AR 437-38. Nothing in the record supports a finding that Chester had any complaints related to her carpel tunnel syndrome which limited her ability to work prior to or after her alleged disability onset date of April 11, 2012. The ALJ did not err in failing to assess limitations allegedly associated with Chester's carpel tunnel

syndrome.  The ALJ correctly found that the record does not support any work-related limitations associated with her carpel tunnel syndrome.

## **CONCLUSION**

Judicial review of a decision to deny disability benefits is limited to determining whether the decision is based on substantial evidence based on a review of the entire administrative record. It is the ALJ's responsibility to make findings of fact, draw reasonable inferences from the record and resolve conflicts in the evidence and differences of opinion.  The court has reviewed the Administrative Record as a whole, and weighed the evidence that supports and detracts from the Commissioner's conclusion, and finds that the ALJ's decision is supported by substantial evidence under 42 U.S.C. § 405(g).

For the reasons explained,

**IT IS RECOMMENDED:**

1.  Chester's Motion for Remand / Reversal (ECF No. 14) be DENIED.

2.  The Commissioner's Cross-Motion to Affirm (ECF No. 15) be GRANTED.

3.  The Clerk of Court be instructed to enter judgment accordingly and close this case.

Dated this 26th day of September, 2018.

PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE